F I L E D
United States Court of Appeals
Tenth Circuit

NOV 30 2001

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

WARREN N. MCCOWAN; JOHNNY P.
LUNA; STEVE E. GUERRERO,

      Plaintiffs-Appellants,

v.

ALL STAR MAINTENANCE, INC.;
TIM KING; STEVE SWITZER; TRACY
GORMAN,

      Defendants-Appellees.

No. 00-2040

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-98-581-LH/WWD)

---

Federico C. Alvarez (Rodrigo V. Ramos, Scherr, Legate, & Ehrlich, PLLC, El Paso, TX,
on the briefs), Kelly, Haglund, Garnsey & Kahn, Denver, CO, for Plaintiffs-Appellants.

Charles J. Vigil (Jo Saxton Brayer, Rodey, Dickason, Sloan, Akin & Robb, P.A.,
Albuquerque, NM; David W. Croysdale and Amy Schmidt Jones, Michael Best &
Friedrich, L.L.P., Milwaukee, WI, with him on the briefs), Rodey, Dickason, Sloan, Akin
& Robb, P.A., Albuquerque, NM, for Defendants-Appellees.

---

Before **MURPHY**, **HALL**,[*] and **PORFILIO**, Circuit Judges.

---

     [*]Honorable Cynthia H. Hall, Circuit Judge for the United States Court of Appeals,
Ninth Circuit, sitting by designation.

**PORFILIO**, Senior Circuit Judge.

After three weeks painting houses for All Star Maintenance, Inc., Warren N. McCowan, Johnny P. Luna, and Steve E. Guerrero were terminated, triggering the underlying lawsuit for discrimination based on their Hispanic national origin. This appeal challenges the dismissal of that lawsuit. Because our *de novo* review finds that disposition was premature, we reverse.

In the summer of 1997, All Star Maintenance did business on the White Sands Missile Range in south central New Mexico, providing carpentry, tiling, roofing, and painting services to prepare houses for resale to the federal government. Charles "Burt" Peterson, the project manager responsible for ensuring the efficiency of the overall operation, supervised Tim King, the field superintendent, who, in turn, relied upon Tracy Gorman, an on-site foreman and quality control person, as well as Steve Switzer, who did concrete and carpentry work. Concerned that production goals were not being met by his first crew of three painters, Mr. King hired Warren McCowan, Johnny Luna, and Steve Guerrero. Typically, this second painting crew checked into the All Star field office in the morning to get a work order, drove to the house the three were assigned to paint, and returned at the end of the day to clock out. During those days, McCowan, Luna, and Guerrero were called, overheard, or were told about racial epithets which

peppered the office or work area. Three weeks after they started, this second crew of painters complained to Mr. King about the unprovoked epithets and comments. Mr. King terminated the second crew. The actual reason for that action formed the basis of this lawsuit.

In their complaint, Plaintiffs McCowan, Luna, and Guerrero, each a United States citizen of Mexican origin, alleged All Star, Tim King, Tracy Gorman, and Steve Switzer (All Star, collectively) discriminated against them because of their race by subjecting them to racially derogatory language in a racially hostile environment and then terminating them when they complained, all in violation of their rights under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c). All Star moved for summary judgment contending "the alleged racial remarks were not so severe or pervasive as to alter the conditions of their employment and Plaintiffs did not complain about the alleged remarks until the day their position were [sic] eliminated."

In support of the motion, All Star stated "prior experience" and "industry standards" dictated a three-person crew should paint the interior of a house in a day. Plaintiffs only painted "6-7 houses" during the three and a half weeks they worked for All Star, causing the company to lose about $600 on each house painted. A week or two before terminating Plaintiffs, All Star stated it subcontracted the painting work and discovered it could save from $400 to $600 per house. Thus, "All Star ceased *hiring* painters solely for financial reasons." (italics added). After examining the

"backgrounds" of the six painters who comprised the two painting crews, All Star reassigned the workers in the first crew and terminated Plaintiffs. The consequence, All Star asserted, was circumscribed by its business judgment and was not a pretext for discrimination.

Further, All Star challenged Plaintiffs' evidence of racially derogatory comments, relegating the language and epithets to the coarse dominions of the construction industry and cushioning and diminishing the words' effects with various hearsay characterizations. Thus, while statements like "wannabe cholos," "fucking stupid Mexicans," "my south of the border friend," "fucking cholo attitudes," "spik," "burrito-eating motherfucker," "worthless nigger," "nigger for a day," or "fucking painter" might have been uttered and overheard, the language was not always directly spoken to Plaintiffs nor communicated in the presence or with the knowledge of Tim King, All Star argued. Moreover, because Plaintiffs spent only a few minutes at the beginning and end of the day in the office where some of the offensive language might have been voiced and otherwise worked alone in a house for the entire day over a period of only three weeks, they could not survive the factual showing necessary for an intimidating or hostile work environment.

Although Plaintiffs countered with deposition testimony, various affidavits, and an EEOC affirmative finding, as well as a list of specific instances of the offending discriminatory incidents and comments, the Magistrate Judge assessed each claim

against this documentary evidence, cataloging some of the statements as personal opinions and others as "not even by a stretch" to qualify as racially derogatory (for example, "f---- painters"), and concluded, under the extant law, Plaintiffs had presented a prima facie case but failed to carry their burden to "rebut the presumption that Defendants terminated [them] for legitimate, nondiscriminatory reasons." The Magistrate Judge then granted All Star summary judgment on Plaintiffs' claims of discriminatory termination, retaliation, and hostile environment as well as those of negligent and vicarious liability for the alleged conditions of employment.

Our jurisdiction, premised on 28 U.S.C. § 1291,[1] requires we review the order granting summary judgment *de novo* utilizing the same legal standards employed by the district court as dictated by Federal Rule of Civil Procedure 56(c). ***O'Shea v. Yellow Technology Servs., Inc.***, 185 F.3d 1093, 1096 (10th Cir. 1999). If that review of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[1]In response to this court's question about jurisdiction, whether the United States Magistrate Judge's order is final, the parties submitted briefs stating each signed separate consent forms agreeing to have the Magistrate Judge conduct all proceedings and "order the entry of final judgment." New Mexico local rule 73.2 for the United States District Court states, "[f]ull time Magistrate Judges are designated to exercise civil trial jurisdiction and, by consent of all parties, may handle any dispositive matter including trial." D.N.M.L.R.- Civ. 73.2. We have stated a Magistrate Judge's recommendation is a final appealable decision under 28 U.S.C. § 1291 if the parties have consented to have the Magistrate Judge conduct all the proceedings, including a bench or jury trial, and if the district court has designated the Magistrate Judge to handle any dispositive matters including trials. ***Haney v. Anderson***, 175 F.3d 1217, 1219 (10th Cir. 1999); *see* 28 U.S.C. § 636(c). Hence, we have jurisdiction to review this final order.

the affidavits, if any," reveals "there is no genuine issue as to any material fact[,] ... the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Ortiz v. Norton*, 254 F.3d 889, 893 (10th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* In this review, we have oft reminded that all inferences arising from the record before us must be drawn and indulged in favor of the party opposing summary judgment. *O'Shea*, 185 F.3d at 1096. "In this respect, we must view the evidence in context, not simply in its segmented parts." *Id.* That is, given the allegations of the complaint, "we must examine the totality of the circumstances, including 'the context in which the alleged incidents occurred.'" *Id.* (citation omitted).

Here, Plaintiffs challenge the correct application of this latter directive, urging the district court substituted its evaluation of separate instances of discriminatory statements extricated from the overall context in which the incidents occurred. This approach, they contend, "robs the incidents of their cumulative effect." Moreover, by deeming the context of the comments the rough hewn and vulgar environment of construction work, Plaintiffs complain the court failed to evaluate the totality of the specific incidents in light of the record they presented.

We agree. A tenet of summary judgment review, as we have stated, requires we indulge all reasonable inferences in the nonmovant's favor. In this case, not only did the court fail to view the evidence in this fashion, but also it ignored some of the facts presented, permitting it to resolve what otherwise would be material facts more appropriately reserved for a rational jury. Moreover, even if this review did not convince us of the presence of a genuine issue of material fact, we would have to conclude the district court failed to correctly apply the substantive law.

What is then before us is whether Plaintiffs' version of their three weeks' employment at All Star supports a viable claim of racial discrimination in the several forms alleged.[2] For § 1981 and Title VII, the legal construct into which they must fit their factual presentation places the "not onerous" burden of establishing a prima facie case on Plaintiffs, requiring proof by a preponderance of the evidence Plaintiffs belong to a protected class, in this case, a racial minority; were qualified for the job they were hired to perform; despite the qualifications, were terminated; and the job was not eliminated after their discharge. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Ortiz,* 254 F.3d at 894; *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999). As

---

[2]Those claims include discrimination based on Plaintiffs' Mexican origin; the existence of a hostile work environment; and All Star's liability for the hostile environment. Although the district court addressed Plaintiffs' claim of retaliatory discharge, we do not believe that disposition is preserved in this appeal.

***Burdine*** explained, establishing the prima facie case "creates a presumption that the employer unlawfully discriminated against the employee," 450 U.S. at 254, shifting the burden to the employer to rebut the presumption of discrimination by producing evidence the termination was based on a legitimate, nondiscriminatory reason. "The explanation provided must be legally sufficient to justify a judgment for the defendant ... to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." ***Id.*** at 255-56. Plaintiffs must then meet their ultimate burden of persuading the court by demonstrating the proffered reason is not the true reason either directly by showing a discriminatory reason more likely motivated the employer[3] or indirectly by challenging the employer's reason as unworthy of credence. ***Id.*** at 256.

This latter burden was recently elucidated in ***Reeves v. Sanderson Plumbing Prods., Inc.***, ___U.S.___, 120 S. Ct. 2097, 2109 (2000), which rejected "the premise that a plaintiff must always introduce additional independent evidence of discrimination," and credited plaintiff's evidence he properly did his job and had no responsibility for failing to discipline late and absent employees, underlining the implausibilities and inconsistencies in the employer's justification. As the Court reiterated, "[p]roof that the

_____

[3]"When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, this court has held that the plaintiff must demonstrate a nexus exists between [the] allegedly discriminatory statements and the decision to terminate her." ***Perry v. Woodward***, 199 F.3d 1126, 1134 (10th Cir. 1999) (citing ***Cone v. Longmont United Hosp. Ass'n***, 14 F.3d 526, 531 (10th Cir. 1994)).

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 2108 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517 (1993)).

Further, the Court has broadly read Title VII[4] "to strike at the entire spectrum of disparate treatment of men and women in employment which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* Plaintiffs' proof of this claim derives from the quantum of evidence produced for their Title VII claim.

"For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting *Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir.

---

[4]Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

1998) (internal quotation marks and citations omitted)). While we judge that atmosphere both objectively and subjectively, *Harris*, 510 U.S. at 21-22, we must look at all the circumstances "from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Given this task, our precedent underscores "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'" *O'Shea*, 185 F.3d at 1098 (quoting *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994) (citation omitted)).

Here, the court assumed "without deciding" Plaintiffs established a prima facie case of race discrimination. We must then turn to Plaintiffs' proof to decide whether there is any material fact which precludes the court from concluding as a matter of law that All Star's explanation is worthy of credence.

That evidence, taken in the light most favorable to Plaintiffs, *Schwartz v. Brotherhood of Maintenance of Way Employees*, ___F.3d___ , No. 00-8045, 2001 WL 1006180, at *1 (10th Cir. Sept. 4, 2001), establishes that Tim King hired Plaintiffs because, he stated, the first crew was not painting the houses fast enough. King acknowledged Plaintiffs were paid Davis-Bacon wages set by the federal government, about $10 an hour, which were considered good money for painting in that area. King asserted he wanted his painting crews to meet industry standards which set 20-24 hours to paint an 1100 square foot house.

Plaintiffs each described their walking into the weekly safety meeting in the field office and, at least once, being greeted by Steve Switzer,[5] "Hello, my Mexican friends," with Tim King and Burt Peterson present, or hearing Tracy Gorman call them "cholo-attitude motherfuckers," or "constantly" abiding the words "nigger" or "spik." Steve Guerrero described hearing Switzer utter "a bunch of burrito-eating motherfuckers" as they got off work with Tim King, Tracy Gorman, and another Anglo worker present, but "he was always dogging us in some way." Each stated he felt uncomfortable and unwanted. Nonetheless, Mr. McCowan explained as they would drive home at the end of a day, Joe Hernandez, who had worked for All Star longer, would try to calm them down, telling them to "blow it off" because it is a good job, "good money, you can take a lot for that kind of money, you know." Mr. McCowan stated, "Especially me. I had never had a job paying that kind of money. That's the reason why I didn't report it sooner, because I didn't want to get terminated because of it."[6]

Mr. Luna stated he heard Gorman and Switzer making racially derogatory comments directed either at him, his crew, or Joe Hernandez who would be with them. For one instance, he described passing by a conversation and overhearing "spik" or another epithet, and the occasion when Switzer uttered "stupid fucking Mexican" or

[5]Mr. Switzer, a defendant in this lawsuit, did not appear for his deposition even after a subpoena was served upon him. He no longer works for All-Star.

[6]The court did not address this testimony, instead crediting All Star's statement Plaintiffs never reported any racial abuse. Indulged in Plaintiffs' favor, the explanation of the futility of reporting the offensive speech finds support in the record.

"burrito-eating motherfucker." He stated that although he loved working with his hands, he dreaded the day's racism ahead of him, "Even though this job lasted only three weeks, I felt enough racism to last me a lifetime."

In his deposition, Mr. Guerrero described Tim King's giving Gorman a poster containing an anti-discrimination message. Mr. Guerrero stated, "[H]e (Tim King) kind of chuckled along with him, and he said it out loud to where Tim King could hear, that 'discrimination is not against the law, it's a joke.' And that's one thing that really got to me because everybody thought it was real funny. And this was right in front of Tim King's desk."

Plaintiffs produced deposition testimony in which other All Star employees stated racial slurs were common and not limited to Hispanic employees. Joe Hernandez kept a log of the comments and incidents which Plaintiffs included in the record. Gorman, who sported an Aryan Nation tattoo, agreed that Switzer's comments were "continuous." Gorman acknowledged he called an African-American employee, David Stukes, a "nigger" but not a "worthless nigger."[7] Scott Johnson, an All Star employee, heard Switzer cuss, "Dumb, fucking Mexican," and said, Switzer had a foul mouth. Deponents uniformly stated everyone knew of the verbal abuse, noting that while some of the language was generic cursing, much had ethnic and racial overtones.

---

[7]Three months after Plaintiffs' termination and shortly after All Star received notice of the EEOC action, All Star placed Gorman on temporary leave because of his use of this pejorative. He was subsequently fired.

Gorman, designated by King as his on-site foreman, described the banter at the work site as "general job site construction joking," and although he stated he never made racial comments, conceded he might have said "nigger," but not "worthless nigger" to David Stukes. He stated he had the authority to reprimand workers and had reprimanded all of the painters at one time or another.[8]

Mr. Guerrero described going to Mr. King to complain about the racial harassment.

> And he kind of laughed. Naw, really? And I said, Yes, sir. And he looked at all of us, me, Johnny and Neal were there - and he goes, Well, what's being said? Who said what? And I go. You know what's been said. I didn't want to say anything. No, come on, tell me what's been said. And I told him burrito-eating motherfuckers and stupid fucking Mexicans. And he was all, Well, you need to tell me who's saying it. And I said, I'm not going to mention no names, 'cause you know exactly who I'm talking about. And he started laughing. Oh, well, I'm sorry, you guys, and I know who to go to. He goes, I knew it was going on, but I didn't think any of you guys were taking any of it serious. And we were all, yeah, well, we have been taking it serious, and it's really gotten to us now, you know, we would like for it to stop, you know. At that point he: Okay, you guys, I'm sorry. I'll get on it. I'll get on it. And that was it.

Each of the Plaintiffs testified they were told by King and others they "were doing good, keep up the good work. We were kicking the other painting crew's butt, was his exact words he would tell us." King testified after helping Plaintiffs get supplies, he bought different paint and roller skins to make the work more efficient but never wrote

---

[8]Although the district court found all of the statements were made by non-decision makers, the record remains murky both as to Mr. King's awareness of the verbal environment and of Gorman's actual authority in the workplace.

up or told the crew their performance was deficient. Other workers who came by would tell the second crew it was quicker than the first and there were no problems with their work. All Star recognized if carpenters did not finish preparing a house, the painting work might be slowed.

In light of a record that spans only three weeks, the court's characterizing the racial harassment as "isolated" evincing more "casual comments, or accidental or sporadic conversation,"[9] and as statements of personal opinion not made by individuals responsible for their hiring or firing misses the mark. We have repeatedly stated that in a case alleging a violation of Title VII and the presence of a racially hostile work environment, "the existence of [racial] harassment must be determined 'in light of the record as a whole,' and the trier of fact must examine the totality of the circumstances, including 'the context in which the alleged incidents occurred.'" *O'Shea*, 185 F.3d at 1096 (quoting *Penry*, 155 F.3d at 1262 (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 69 (1986)).

Such a thorough examination of the record is required because the very term 'environment' indicates that allegedly discriminatory incidents should

---

[9]The court cited *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987), which reversed the district court's rejection of plaintiff's racial and sexual harassment claim, in part, on the ground that the court "may aggregate evidence of racial hostility with evidence of sexual hostility." *Id.* at 1416. It also relied upon *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), in which the court affirmed summary judgment for the employer, rejecting plaintiff's Title VII claims on a record that disclosed the racial slurs came on a couple of occasions from two coworkers, hardly the "steady barrage of opprobrious racial comment," the *Hicks* court noted. 833 F.2d at 1412-13.

not be examined in isolation. Under this interpretation, because conduct which is not [race]-based may form a part of the context or environment in which the discriminatory conduct is alleged to have occurred, such conduct may be relevant to, and should be considered in, evaluating a hostile work environment claim.

*Id.* at 1097 (internal quotation marks omitted).

Accordingly, when we examine the context of this Title VII claim, we look at both specific hostility targeting Plaintiffs as well as the general work atmosphere. Thus, even if a comment about Plaintiffs' baggy pants or low riders might not be explicitly racial, given the context of the statement, it could be reasonably inferred the remarks were related to Plaintiffs' race and were part of an ongoing, pervasive environment of racial taunting.[10] At this stage, too, and in this context, rejecting some of the frequently uttered and often overheard comments as hearsay distorts the analysis of the work environment and deprives Plaintiffs' evidence of its overall impact.

Indeed, in that totality evaluation, the district court resolved what it judged to be the uncontroverted fact that Plaintiffs spent only between two to fifteen minutes in the office and worked for All Star only three weeks as proof that the work environment could not have been as offensive and racially hostile as alleged. These circumstances,

---

[10]Within this "context," comments the court found not directed at Plaintiffs (calling a Brazilian worker "Duh" or "idiot" or Switzer's calling Joe Hernandez his "nigger" or "nigger for a day" or "south of the border friend") cannot simply be discarded on that ground but must be weighed on the side of reasonable inferences.

however, cut both ways. Alternatively, the shorter exposure time supports the equally plausible inference the abuse was so offensive as to taint the entire job site.

Although the district court did not evaluate All Star's explanation for terminating Plaintiffs against this evidence, the employer's business judgment cannot be immunized from the totality of the circumstances inquiry. Here, the district court found even if racially hostile comments were made, Plaintiffs failed to establish the nexus between the remarks and their termination. That nexus, essential in establishing the comments constitute direct evidence of discrimination, is not the test in proving discrimination with circumstantial evidence. We think the record is not so clear.

The record discloses King and Peterson were dissatisfied with both painting crews; in fact, King stated he hired the second crew because the first crew could not get the painting job done. Neither King nor Gorman told Plaintiffs their work was unsatisfactory. King stated shortly after Plaintiffs were hired, All Star decided to try subcontracting the painting work although the record does not disclose whether, in fact, the subcontractors met the performance goals. All Star stated it looked at the "backgrounds" of the first painting crew and judged the workers were more experienced, although it kept no written files on any employee's background and stated one of those painters could also tile, a skill possessed by at least one of the Plaintiffs. Further, explaining its business judgment, All Star minimized the hostility Plaintiffs' might have encountered in the office and from other workers by boasting their job performance did

- 16 -

not suffer. Again the inference may cut both ways, however, and may permit a rational juror to infer Plaintiffs were good workers who should have been continued in All Star's employ but for their complaining about the racial harassment.

Thus, All Star's "business judgment" with the jargon of economics, efficiency, bottom lines and profit is not impervious to alternative proof. The court's inquiry is not whether the employer made the best choice, but whether it was the *real* choice for terminating Plaintiffs. With no evidence of the criteria used to evaluate the basis for the decision to retain one painting crew over the other in the face of the inconsistencies and contradictions in the record, the court improperly resolved questions of fact reserved for the jury.

Finally, we would observe the totality of the circumstances analysis in cases like the one before us obviates what would otherwise be the court's call in deciding how many racist comments constitute harassment or whether general profanity and vulgarity mixed with specific racial, ethnic, or sexual epithets equate to the sum of pervasiveness required by *Harris.* Rather, by framing the evidence on *summary judgment* within the context of this particular workplace, we eliminate the suggestion that a certain number of comments is or is not actionable, as All Star has advanced, and leave the resolution to the trier of fact.

Therefore, because the record discloses Plaintiffs established summary judgment is precluded by a genuine issue of material fact, we **REVERSE**. The case is **REMANDED** for further proceedings consistent with this opinion.

00-2040, *McCowen, et al. v. All Star Maintenance, et al.*

**MURPHY**, **J**., concurring

I join the majority opinion but write separately to elaborate on why I believe Plaintiffs met their prima facie burden on their wrongful termination claims. All Star asserts, and Plaintiffs do not dispute, that after Plaintiffs were terminated, subcontractors performed the painting work previously performed by Plaintiffs. All Star argues that Plaintiffs, therefore, cannot demonstrate that their positions remained open after their discharge and thus cannot establish the fourth element of their prima facie case. All Star's construction of the fourth element is far too narrow. As this court stated in *Perry v. Woodward*, "[t]he elimination of the position, however, does not necessarily eviscerate a plaintiff's claim that her discharge was racially motived." 199 F.3d 1126, 1140 n.10 (10th Cir. 1999). Here, Plaintiffs demonstrated that after their discharge All Star had a continuing need for individuals to perform the same work previously performed by Plaintiffs. That the work was performed by subcontractors and not employees of All Star is immaterial for purposes of Plaintiffs' prima facie burden. Accordingly, it is indisputable that Plaintiffs satisfied their prima facie burden as to their wrongful termination claims.

00-2040, *McCowen, et al. v. All Star Maintenance, et al.*

**HALL**, **J**., concurring

I also join the majority in reversing the district court's grant of summary judgment as to Plaintiffs' disparate treatment and hostile environment claims. I write separately simply to note my view that the material issue raised by Plaintiffs in the disparate treatment claim is their treatment relative to the other painting crew rather than the hiring of the subcontractors. All-Star's proffered reason for replacing the Plaintiffs with subcontractors was simply to save money. Plaintiffs provided no evidence that this clearly legitimate non-discriminatory reason for replacing them as painters was pretextual. By contrast, All-Star provided essentially no evidence in support of its burden to articulate a legitimate nondiscriminatory reason for retaining the three non-Plaintiff painters as general laborers in preference to Plaintiffs. All-Star was required, as part of the *McDonnell Douglas* framework, to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff[s'] rejection." *Burdine*, 450 U.S. at 255. In so doing, it was required to articulate a reason that was "clear and reasonably specific." *Id.* at 258. The bare statement by Mr. Peterson that he and Mr. King looked into the candidates' work backgrounds when determining which to retain does not, in my view, satisfy this burden. Even assuming that it does, Plaintiffs' evidence that they were in fact considered the better work crew is sufficient, in the face of this bare assertion, to raise a genuine issue of pretext.