*929 BRISCOE, J., Circuit Judge,
concurring in part and dissenting in part.
I concur in part and respectfully dissent in part. With one exception, I agree with the majority. Regarding the hostile work environment claim, I read the majority’s opinion to improperly consider witness credibility, improperly weigh evidence, and omit meaningful analysis of the totality of the circumstances surrounding Nettle’s allegations. Accordingly, I would reverse the district court’s grant of summary judgment for the Clinic on Nettle’s hostile work environment claim.
To affirm the district court’s grant of summary judgment on Nettle’s hostile work environment claim, the majority begins by quoting the standard elements of such a claim — a plaintiff must show that a rational jury could find that the workplace was “permeate[d] ... with ‘discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’ ” Maj. Op. at 920-21 (quoting Tademy v. Union Pac. Corp., 520 F.3d 1149, 1156 (10th Cir.2008)). The majority then implicitly divides Nettle’s allegations into several categories — “vague” statements, comments “made in jest,” specific statements, patient statements, and removed employment duties — and then affirms the grant of summary judgment for each category. While I disagree with the majority opinion’s reasoning for these individual categories, I am more troubled by the majority’s parsing of Nettle’s allegations. “[Ojur hostile environment cases consistently have emphasized the need for the district court to examine the totality of the circumstances when reviewing a summary judgment motion. Indeed, the very term ‘environment’ indicates that allegedly discriminatory incidents should not be examined in isolation.” Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1262 (10th Cir.1998) (citation omitted).
I. Divided Allegations
A. “Vague” Allegations
The majority reviews the district court’s three-pronged reasoning for granting summary judgment. Two of the identified reasons relate to the specificity of Nettle’s allegations. E.g., Maj. Op. at 921 (“[S]he has not described the exact nature of many of the comments,” and “she cannot recall with any specificity the dates when many ... comments were made.”).[1] The third reason isolates Nettle’s concession that portions of her employment “were good years.” Id.[2] The majority agrees with the district court’s assessment of Net *930 tie’s allegations. Id. at 921 (“The[] [allegations in Nettle’s appellate brief] suffer from many of the problems that the district court identified in its opinion.”). The majority affirms the grant of summary judgment for this category of Nettle’s allegations — “that Mr. Hunter [the Chief Executive Officer at the Clinic] would make ‘frequent’ racial comments at staff meetings and was generally ‘negative,’ as well as the statements by her co-workers that there was discrimination at the [C]linic”— by applying the standard that “[v]ague, conclusory statements do not suffice to create a genuine issue of material fact.” Id. at 922-23. The majority opinion also discounts Nettle’s allegations regarding Hunter’s comments by concluding, “It cannot be assumed that all of his comments about different tribes, and about those whose skin is lighter or darker than others, related to her.” Id. at 923 (quotation and citation omitted).
In my view, this reasoning improperly weighs the credibility of Nettle’s submitted evidence and labels comments as “vague and conclusory” when they are not. Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105-06 (10th Cir.2008) (“[I]t is not our province at the summary judgment stage to ... make credibility determinations.”).
As stated by the majority, “Nettle is one-half Caucasian and one-half Native American, a member of the Delaware/Cad-do Tribes.” Maj. Op. at 916. There is no dispute that Nettle was a light-skinned Native American, and that Hunter allegedly targeted her for ridicule because of her skin color, including comments regarding the Delaware Tribe such as “they want to pretend and be like Indians of browner skin.” R. 12; R. 154.
The majority also acknowledges that Nettle alleges that “in 1993 in all staff meetings, there would always be at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people and from 1993 to her termination date [in 2004] there were statements of discrimination by Mr. Hunter,” but the majority characterizes this allegation as “vague.” Maj. Op. at 921 (quotations and alterations omitted). While I concede that the cited statement could benefit from more specificity, portions of the statement do not equivocate on the key proofs: frequency, location, content, and target of the alleged offensive comments. Nettle’s statement is based on personal knowledge. With the specifics she has set forth, she has presented more than a “bald assertion” that she suffered from a hostile work environment. Moreover, because Nettle’s statement does not draw any improper inference or implicit conclusion, I clo not consider the statement to be conclu-sory.
I also disagree with the majority’s assertion that “[i]t cannot be assumed that all of [Mr. Hunter’s] comments about different tribes, and about those whose skin is lighter or darker than others, related to [Nettle].” Maj. Op. at 923. At the summary judgment stage, “we must construe all facts and reasonable inferences in favor of the non-moving party.” Bryant v. Indep. Sch. Dist. No. 1-38, 334 F.3d 928, 931 (10th Cir.2003). Here, Nettle is the non-moving party. If Nettle’s allegations are true, which must be assumed at this stage, *931 then this evidence would support her hostile work environment claim because it demonstrates a workplace “permeate[d] ... with discriminatory intimidation, ridicule, and insult.” Tademy, 520 F.3d at 1156 (internal quotation omitted). It should be the role of a fact finder in this case, and not the district court on summary judgment, to determine whether the alleged comments made to and about Nettle altered the conditions of her employment.
B. “Comments made in jest”
The majority also discredits portions of Nettle’s allegations as comments made only in jest. Maj. Op. at 923-24, 925. The majority highlights that “as Ms. Nettle concedes, many of the comments were made jokingly.” Id. at 923-24 (listing record citations where Nettle identifies comments as being made “in jest”). Indeed, the majority notes that in certain circumstances Nettle “no longer found a staff member’s comments offensive because as the years wore on [Nettle] knew she didn’t mean them disparagingly.” Id. at 924 (quotation and alterations omitted). Although the majority acknowledges that “what is funny to one person may be deeply offensive to another,” the majority proclaims that “we cannot disregard the distinction between jesting and insulting.” Id. at 925. Accordingly, the majority determines that Nettle’s allegations of comments made “in jest” are insufficient to create an abusive working environment, stating “where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having ‘alter[ed] the conditions of the victim’s employment and create[d] an abusive working environment.” Id. at 924 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).
I consider this analysis flawed for several reasons. Whether a comment is intended to be insulting or “in jest” is irrelevant to whether there is a steady barrage of opprobrious comments. See EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir.2007) (“We have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim.”). The analysis for whether a statement contributed to a hostile work environment is whether the “victim herself perceived the environment to be abusive” and whether the statement was “so severe or pervasive that an objectively reasonable person would find it abusive or hostile.” Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1089 (10th Cir.2007) (citing Harris, 510 U.S. at 21, 114 S.Ct. 367). Thus, statements intended to be “in jest” can still be opprobrious if they are subjectively and objectively severe or pervasive. No analysis of the “jester’s” intent is necessary.
The majority responds that “[t]his does not mean that the nonmalicious character of comments, as understood both by the speakers and by the recipient of the messages, is ‘irrelevant’ to whether they create a ‘hostile’ or abusive work environment.” Maj. Op. at 925. I agree with a portion of this statement. If the recipient of the messages finds the comments to be non-malicious, the comment fails the subjective portion of the analysis. In that context, the statements made “in jest” would not contribute to a hostile work environment. Conversely, statements that only the speaker considers nonmalicious — but the recipient considers offensive — could con *932 tribute to a hostile work environment if they are objectively severe or pervasive.
The majority overlooks this distinction. The majority relies on Nettle’s statement that some of the statements were made in jest and that she did not find certain, but not all, comments “disparaging[ ] because she knew they were not intended to offend,” id. at 925, as license for the majority to disregard all comments made “in jest.” Simply because Nettle identified comments as “in jest” does not mean that the comments were not subjectively and objectively severe or pervasive. Moreover, Nettle’s ability to distinguish offensive comments from comments received “in jest” and considered to be nonmalicious arguably lends credence to her allegations of frequent racial comments that were not received “in jest.” Thus, the' majority’s conclusion — “where comments are made in jest and the plaintiff recognizes them as such,” these identified comments cannot support a hostile work environment claim — is not universally applicable to all comments made “in jest.” Id. at 924. Because the majority makes no effort to distinguish between comments made “in jest” that Nettle considered offensive and comments made “in jest” that Nettle considered nonmalicious, the majority’s assertion that “we cannot disregard the distinction between jesting and insulting” is specious. Id. at 925.
In addition to blurring the subjective and objective analysis, the majority’s discussion of comments made “in jest” also subtly raises the threshold for hostile work environment claims to be actionable. The majority notes that comments made in jest cannot “be regarded as having ‘alter[ed] the conditions of the victim’s employment and create[d] an abusive working environment,” “unless they are of unusual pervasiveness or severity.” Id. at 924 (citing Harris, 510 U.S. at 22, 114 S.Ct. 367) (emphasis added). First, although the defendant in Harris “claimed he was only joking,” the analysis of Harris does not address or distinguish comments made in jest. Harris, 510 U.S. at 19, 114 S.Ct. 367. Second, Hams notes that “Title VII is violated” when the discriminatory comments are “sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Id. at 925 (emphasis added). I consider the majority’s “unusually” severe or pervasive standard to create a higher threshold of proof for Nettle than the accepted “sufficiently” severe or pervasive standard. Consequently, the majority cites Harris, but heightens the standard Harris set forth. Harris,' however, clarifies that the “severe or pervasive” standard is the baseline for actionable hostile work environment claims and rejects a more stringent standard. Harris, 510 U.S. at 22, 114 S.Ct. 367.
C. Specific Allegations
On the other hand, the majority admits that “[s]ome of this vagueness is inconsequential.” Maj. Op. at 921. The majority then lists some “specific remarks”: (1) “Mr. Hunter commented that Ms[.] Nettle ‘thinks she’s Indian, but we wonder. We have been trying to get rid of her since the day we hired her,” id.; (2) “Mr. Hunter also said ... that people who did not look Indian ‘don’t represent the Indian community well,”’ id.; (3) “Daren Paddyaker[] remarked] that Ms. Nettle was a ‘wannabe Indian,’ ” id. at 922; (4) “Dawn Singleton[] eomment[ed] that [Nettle] was the ‘white counselor,’” id.; (5) “Robyn Sunday, the Chief Operating Officer of the [C]linic, referred to Ms. Nettle as ‘the big-boobed white Renee’ on several occa *933 sions,”[3] id.; (6) “[T]wo employees allege that those who did not appear ‘Indian’ were treated differently at the Clinic,” id.; and (7) “[C]hild patients at the Clinic, and their parents, would sometimes refer to her as ‘white doctor,”’ id. The majority affirms the grant of summary judgment for these specific allegations because they “constitute ‘sporadic ... slurs’ rather than a ‘steady barrage of opprobrious ... comments.’ ”[4] Id. at 922 (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir.1994)). The majority opinion also reduces many of these allegations to “simply identifying] her as ‘white’ ” and concludes that “it could be annoying and irritating for a person of one racial mix to be mistaken for another, but there is no precedent for regarding a mistaken racial identifier ... as opprobrious or abusive.” Id. at 923.
By quoting the “steady barrage of opprobrious ... comments” language, the majority disregards several aspects of Nettle’s allegations and Tenth Circuit precedent. Some of Nettle’s allegations involve more than comments; Nettle also alleged discriminatory conduct. Some of Nettle’s allegations include a steady barrage of comments; Nettle also alleged that at “staff meetings, there would always be at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people.” Maj. Op. at 921 (internal quotation omitted). Similarly, given that three of the listed seven specific allegations include ongoing conduct — Sunday’s insulting description of Nettle being made “on several occasions,” that “those who did not appear ‘Indian’ were treated differently at the Clinic,” and that Clinic patients and their parents “would sometimes refer to her as ‘white doctor’ ” — there is no basis for the majority’s description of the conduct targeting Nettle as “sporadic” in nature.
There is also no basis to support the majority opinion’s conclusion regarding racial misidentification. It is unclear how the majority opinion could find only mistaken racial identity in such comments as, “Nettle thinks she’s Indian, but we wonder” or “wannabe Indian.” Id. at 921-22. To the contrary, in this context it is clear that the description “white Renee” is likely not an example of mistaken racial identity. To me, affirming a grant of summary judgment on discriminatory comments regarding a person’s skin color merits more pre *934 cise analysis because words and epithets regarding a person’s race and color can be “intensely degrading.” See PVNF, 487 F.3d at 799 (quoting Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir.1996) and considering a sexual epithet); Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993) (“Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet ... by a supervisor in the presence of his subordinates.”) (internal citation and quotation omitted).
D. Patient Statements
Nettle alleges that “the patients [of the Clinic] would call her the ‘white doctor.’ ” Aplt. Br. at 37; R. 183, 234. The majority opinion “believe[s] such claims are of little significance in the context of this case,” because “Nettle presents no evidence that her employer encouraged her patients to refer to her as the ‘white doctor....’” Id. at 924.
Because comments made by the patients and their pai'ents are part of Nettle’s workplace environment, they are relevant to the present inquiry. That the patients and their parents were not employees of the Clinic is not determinative. The Clinic may be held responsible for comments by its patients and their parents because there is evidence that they should have known about such comments. See Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1073 (10th Cir.1998) (“We agree with our sister circuits that an employer may be found liable for the harassing conduct of its customers.”); id. at 1074 (“[E]mployers may be held liable in these circumstances if they fail to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.” (quotation omitted)). Accepting Nettle’s allegations as true, if the Clinic introduced Nettle as “white,” it should expect its patients and their parents to follow suit and refer to Nettle as “white.” By this conduct — although it is not clear that the threshold standard requires Nettle to present such evidence — the Clinic arguably has “encouraged” the patients and their parents to refer to Nettle as “white.”
E. Removed Employment Duties
While the majority lists the allegation that “Mr. Hunter said ... that people who did not look Indian ‘don’t represent the Indian community well,’ ” Maj. Op. at 922, Nettle also alleges that she was prevented from representing the Clinic at certain events because she did not “look Indian.” Aplt. Br. at 37; R. 168, 246. With little analysis, the majority opinion brushes these allegations aside as being not severe or pervasive. Maj. Op. at 925 (“We disagree that not being able to attend two events which, ... were only at best a discretionary part of her job, amounts to discrimination that is ‘severe.’ Nor does the fact of being prevented from attending two events from a many-year career show that Ms. Nettle experienced ‘pervasive’ discrimination during her employment at the Clinic.”).
Although the majority would discount this evidence, I consider Nettle’s allegations that she was prevented from representing the Clinic in the community because she did not “look Indian” to be relevant to and give weight to her hostile work environment claim. These allegations, if assumed to be true, are indicative of a workplace where Nettle’s skin color impacted her employment status *935 with her employer, her co-workers, and the community the Clinic served. Further, these allegations contradict other portions of the majority’s reasoning. The majority dismisses all of Nettle’s specific allegations as sporadic or infrequent “comments.” Prohibiting Nettle from representing the Clinic because of her skin color is not a comment; it is an action that directly affects Nettle’s work responsibilities, performance, and status. Only examining whether this alleged conduct was by itself “severe” or “pervasive” disregards the impact of the conduct in the coherent analysis of whether her workplace environment was “permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment.” McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir.2001); Tademy, 520 F.3d at 1162 (listing “whether it unreasonably interferes with [her] work performance” as a consideration in analyzing the frequency or severity of the discriminatory conduct).
II. The Totality of the Circumstances
In my view, the most problematic aspect of the majority’s divide-and-eonquer analysis is that it does not consider Nettle’s allegations in the context of the totality of the circumstances.. We have rejected this approach. See PVNF, 487 F.3d at 799 (“By parsing out the various instances of harassment and characterizing them as gender-neutral, or not pervasive, [the employer] seeks to eschew the proper totality of the circumstances test, which is the touchstone of our analysis of hostile work environment claims.” (quotation omitted)). Moreover, any totality of the circumstances analysis should be considered “ ‘from the perspective of a reasonable person in [Nettle’s] position.’ ” McCowan, 273 F.3d at 923 (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).
There is no indication that the majority considered these circumstances from the viewpoint of a reasonable person in Nettle’s position. Instead, the majority parses and dismisses allegations of discriminatory conduct without regard to Nettle’s circumstances. E.g., Maj. Op. at 922 (“Nettle’s allegations of identifiable discriminatory or harassing conduct constitute ‘sporadic ... slurs’ rather than a ‘steady barrage of opprobrious ... comments.”); id. (“Nettle’s claims that Mr. Hunter would make ‘frequent’ racial comments at staff meetings and was generally ‘negative,’ as well as the statements by her co-workers that there was discrimination at the clinic, do not rise to the level of creating a genuine dispute.”); id. at 924 (“Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having ‘alter[ed] the conditions of the victim’s employment and create[d] an abusive working environment.’ ”); id. at 925 (“We do not believe the facts show that Ms. Nettle’s employer ‘condone[d] or tolderate[d]’ a hostile work environment based on the scattered comments of her patients and their parents.”); id. at 925 (“We disagree that not being able to attend two events which, ... were only at best a discretionary part of her job, amounts to discrimination that is ‘severe’ [or pervasive].”). By segregating subsets of allegations and then analyzing each subset in isolation, the majority fails to consider the totality of the circumstances when addressing Nettle’s hostile work environment claim. See McCowan, 273 F.3d at 925 (suggesting that even conduct that is not explicitly *936 discriminatory may still form a part of the totality of the circumstances).
The majority’s sole effort to put all of these allegations together ■ in context acknowledges that, “the Clinic was not a pleasant place for Ms. Nettle to work. People said crude things, pet projects were taken away from her, and she was made to feel singled out because of her Caucasian appearance.” Maj. Op. at 925. The majority, however, concludes that “Title VIPs standard for redress is a hostile work environment, not an unpleasant one,” stating that Title VII does not remedy boorish, unpleasant conduct and bad taste. Id.
By this reasoning, the majority either improperly weighs evidence or reduces hostile work environment claims to semantics. It is axiomatic that at the summary judgment stage, “it is not our province ... to weigh the evidence.... ” Sanders, 544 F.3d at 1105-06. In the context of hostile work environment claims, this prohibition against weighing evidence gains significance as we have noted that the “severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact.” Herrera, 474 F.3d at 680 (quotation omitted).
Based on these precedents, I cannot agree with the majority’s characterization of Nettle’s workplace as merely “unpleasant” and not “hostile.” Nettle does not allege simply boorish conduct or behavior in bad taste. She alleges conduct that “singled [her] out because of her Caucasian appearance,” Maj. Op. at 925, including frequent racially-based comments, jokes, and decisions that impacted her job duties. The majority offers no explanation for why Nettle’s subjective view of her workplace is objectively insufficient to support her hostile work environment claim.
In the final analysis, I would conclude that Nettle’s allegations, taken as a whole, are sufficient to create a question of fact as .to whether her workplace was “permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment.” McCowan, 273 F.3d at 923. I would reverse the district court’s grant of summary judgment on Nettle’s hostile work environment claim.

. Unless otherwise specified, I omit the majority’s quotation of the district court opinion.

. Nettle was employed with the Clinic for “thirteen[] year[s],” ending in 2004. Maj. Op. at 921. Nettle conceded that “[19]96 ... until [19]99 were good years.” Id. at 921. The majority opinion makes much of this concession, ”not[ing] ... that Ms. Nettle was employed by the Clinic for over a decade, and that she conceded that she was treated favorably for a significant portion of that time, from 1996 to ‘around 1999.’ ” Id. at 922.
The majority opinion’s reliance on this time period raises two concerns. First, a reasonable inference would be that the last five years of Nettle's employment were not good years. If three years constitutes a "significant portion” of Nettle's tenure with the Clinic, then a more recent five years is a more consequential quantity of her employment. Second, I fail to understand how this concession negates her hostile work environment claim. The central analysis should be the totality of the circumstances surrounding Nettle’s employment. Penry, 155 F.3d at 1262 (“ 'A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must *930 concentrate not on individual incidents [or periods], but on the overall scenario.'") (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990)); Maj. Op. at 921 (“After all, the point of such claims is that the discrimination was ongoing and pervasive ... and not at isolated points in time.'').

. The majority chides the dissent for “focus[ing]” on this alleged description and considers the "sting in the comment [to be] its sexism.” Maj. Op. at-n. 4. This criticism by the majority for "focus[ing]” on Sunday’s description is puzzling as this reference to the description, which quotes the majority opinion, is the only reference to the full description. Further, by finding “sting” in only the sexist portion of the remark, the majority disregards entirely the “white Renee” portion of the description.

. The Supreme Court has repeatedly stated that "[fjor ... harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim’s] employment and create an abusive working environment.” Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quotation omitted); Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). This court has analyzed the severe or pervasive element by applying the majority's “steady barrage of opprobrious [ ] comments” language in several opinions. E.g., Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir.2007) (quoting Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir.2005)); Ford v. West, 222 F.3d 767, 777 (10th Cir.2000) (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir.1994)). Arguably, by requiring a "steady barrage” and "opprobrious comments," this application has improperly converted a disjunctive analysis, “severe or pervasive," into a conjunctive analysis, requiring "severe and pervasive.”