**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RENEE EXENDINE NETTLE,

        Appellant/Plaintiff,

v.

CENTRAL OKLAHOMA
AMERICAN INDIAN HEALTH
COUNCIL, INC., d/b/a THE
OKLAHOMA CITY INDIAN CLINIC,

        Appellee/Defendant.

No. 08-6023

(Western District of Oklahoma)

(D.C. No.5:05-CV-01288-W)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BRISCOE** and **McCONNELL**, Circuit Judges.

Renee Nettle, a former employee of the Oklahoma City Indian Clinic ("the

Clinic"), alleges that she was repeatedly harassed at work and fired when she

complained about it. She filed a civil rights suit against the Clinic. The Clinic

was granted summary judgment on all claims. Ms. Nettle appeals, and we affirm

the judgment of the district court.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

## I. Facts

Ms. Nettle is a one-half Caucasian and one-half Native American, a member of the Delaware/Caddo Tribes. She is light-skinned and sometimes mistaken for a Caucasian. Ms. Nettle testified that she was "[b]y far" the person with the "lightest skin color" in the family services, R. 238, and that "most people to look at me they don't see me as Indian, identifiably Indian." R. 243. Ms. Nettle worked for the Oklahoma City Indian Clinic ("the Clinic"), whose "primary function is to provide medical and other health-related services to Native Americans." R. 11. The Clinic is part of the Indian Health Service (IHS), which is permitted by law to give a hiring preference for Native Americans. According to the Indian Health Service website:

> The purpose of this hiring preference is to support Indian participation in self-government, to further the Government's trust obligations to tribes, to encourage American Indians and Alaska Natives to pursue higher education, and to enhance the positive effect of having Indians administer matters that affect Indian tribal life. The preference is granted to Indians not as a racial group but as members of sovereign tribal entities. The legislative history of Indian Preference hiring law reflects Congress' awareness that non-Indians would be at an employment disadvantage in the IHS and the BIA.

http://info.ihs.gov/Infrastructure/Infrastructure7.pdf. Ms. Nettle worked for about eleven years (August 13, 1993 to December 31, 2003) as a Child Development Specialist in the Clinic's Community Services Department. Dist. Ct. Op. 1. From January 1, 2004, until her termination in November of that year, her job title was Native American Youth Specialist. R. 11. As a Child Development Specialist,

Ms. Nettle's duties included working with and counseling Native American families and their children, although she was never licensed as a counselor. Dist. Ct. Op. 2. As Native American Youth Specialist, Ms. Nettle's job was to "provide Health Promotion/Disease Prevention services directed towards American Indian youth" and she was responsible for "mental health, substance abuse and social work service issues[.]" Dist. Ct. Op. 2. During her time at the Clinic, Ms. Nettle received positive job evaluations, and was never subject to any disciplinary action. R. 12; R. 112–16. She had been called a "wonderful asset" to the Clinic. Dist. Ct. Op. 3.

The Chief Executive Officer at the Clinic was Terry Hunter, who is part Caucasian and part Native American, with tribal membership in the Kiowa Tribe and with tribal affiliation in the Delaware Nation and the Caddo Tribe. Aple. Br. 6. His skin pigmentation is darker than Ms. Nettle's. R. 12, 83, 163, 237–38. In her complaint before the district court, Ms. Nettle said that Mr. Hunter would make "frequent comments in the workplace about different Native American tribes whose skin colors were lighter or darker than other Native American tribes," and suggested that some employees were too "white." R. 26. Mr. Hunter also, according to Ms. Nettle, said of her that "she thinks she's Indian, but we wonder" and "on other occasions" made "derogatory statements about the Delaware tribe . . . [such as] that 'they want to pretend and be like Indians of

browner skin.'" R. 12; R. 154. Although she knew that some of the comments might have been in jest, she still found many of them offensive. R. 171.

Ms. Nettle also accused Robyn Sunday, the Clinic's Chief Operating Officer, of making derisive comments about Ms. Nettle and her appearance, saying at one point that she wanted to fire "white Renee." R. 13. And she asserts that patients in the Clinic would call her the "white doctor." Aplt. Br. 37.

In addition to the comments directed at her, Ms. Nettle alleges that the Clinic "removed several activities for which [she] was responsible and gave them to other employees." R. 168. The reason for this, she alleges, was because Mr. Hunter believed that her light skin and Caucasian appearance rendered her a poor representative for the Clinic in the Native American community. Aplt. Br. 5.

Ms. Nettle eventually filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 22, 2004. She checked off the boxes on the form indicating that she was claiming discrimination based on race, color, and age. The text of the charge read that "Mr. Hunter would make comments about different tribes, and about those whose skin is lighter or darker than others. I and other employees are treated differently because of our tribe or skin color." R. 390. The document put March 10, 2004 as the earliest date discrimination took place and October 20 as the latest. *Id.* In March 2004, the Clinic had canceled youth activities of which Ms. Nettle was in charge. R. 163.

-4-

On November 1, Ms. Nettle was placed on "administrative leave pending an investigation" into two matters: a memo Ms. Nettle had written on October 27 denying responsibility for a break-in at the Clinic offices, and whether Ms. Nettle had counseled a patient after being directed not to. Dist. Ct. Op. 7. Despite having been placed on administrative leave, Ms. Nettle used a Clinic van that same day to deliver materials for a Clinic function. *Id.* Ms. Nettle testified that she had been instructed by her supervisor to go ahead and transport the materials. Aplt. Br. 9; R. 101.

In a letter dated November 1, 2004, Ms. Nettle was informed that she had been fired, effective November 1, 2004, for "misconduct," including her continuation of "counseling patients after being given a directive to cease all individual counseling." Dist. Ct. Op. 8. Ms. Nettle filed a second EEOC charge alleging that she had been terminated in retaliation for filing her first EEOC Charge. R. 14. The Notice of Discrimination the Clinic received for Ms. Nettle's first charge was dated November 5, 2004, four days after the Clinic fired Ms. Nettle, suggesting that the termination could not have been in retaliation for the charge. Dist Ct. Op. 9. Ms. Nettle, however, testified that she had filed her charge on October 22 and that an employee with the EEOC told her she would faxing her Charge to the Clinic "immediately" and "that day." R. 274, 285.

Ms. Nettle filed suit against the Clinic in federal district court on November 4, 2005. R. 2. In her original complaint, she alleged race and color

discrimination, claiming that the comments of Mr. Hunter and others created a hostile work environment. She also alleged that she was fired in retaliation for filing her first EEOC charge. R. 29, 30. Ms. Nettle did not plead age discrimination in her original complaint, although she had checked off the box in her EEOC Charge, and she eventually conceded it. R. 56, 191. She also later conceded her claim for race discrimination. R. 191, 394. But in her reply to the Clinic's motion for summary judgment, Ms. Nettle asked the court to allow her to maintain a cause of action for discrimination based on national origin. R. 191.

The district court granted the Clinic's motion for summary judgment. The district court held that (1) under the "totality of the circumstances," no reasonable juror could find that the comments that were directed at Ms. Nettle created a hostile work environment, (2) Ms. Nettle did not make a prima facie showing that she had been treated adversely because of her skin color, and (3) there was no causal connection between Ms. Nettle's filing her first EEOC charge and the Clinic's decision to fire her, hence no retaliatory termination. Dist. Ct. Op. 15, 18, 21. The district court also held that her national origin claim was not administratively exhausted, because she did not "identify national origin as a basis for discrimination in her EEOC Charges of Discrimination." *Id.* at 24.

Ms. Nettle appeals. We review the district court's decision de novo, applying the same legal standard used by the district court, *McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001). Summary judgment is appropriate only if

-6-

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party," and the nonmovant is given "wide berth to prove a factual controversy exists." *Id*. (citations omitted).

## II.  Retaliatory Discharge

Ms. Nettle argues that the court erred in finding that she had not made a prima facie showing of retaliatory discharge.  In her second filed EEOC Charge, Ms. Nettle said that she believed that she had been retaliated against "for complaining of protected activity in my . . . charge still pending before the Commission."  R. 33.  To prove a prima facie case for retaliation, Ms. Nettle must show that she engaged in protected activity, that the Clinic took a material "adverse action" against her, and that there was a causal connection between the protected activity and the adverse action.  *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).  The district court noted that it was "undisputed" that filing an EEOC charge is protected activity, against which the Clinic could not have retaliated by firing Ms. Nettle.  Dist. Ct. Op. 19.  This leaves Ms. Nettle's burden to show that there was a causal connection between the filing of the EEOC charge (the protected activity) and her termination (the adverse action).

The Clinic objected that Ms. Nettle could not show a causal connection, and the district court agreed. Ms. Nettle filed her first Charge of Discrimination on October 22, 2004, and the Clinic fired her on November 1 of that same year. A causal connection between an employee's protected activity and an employer's adverse action "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive," such as when the protected conduct is "closely followed" by an adverse action. *Burrus v. United Telephone Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). But the Clinic maintains that it was not aware that Ms. Nettle had filed her Charge with the EEOC until November 4, so that it could not have fired her *because* of the charge, even if it fired her *after* she filed the charge. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1195 (10th Cir. 2007) ("Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee *because* of the protected conduct . . . ."), *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993) ("to establish a 'causal connection,' plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity").

Ms. Nettle testified in her deposition that the person who "took her information" at the EEOC, Carrie Hill, indicated that she was going to fax her charge to the Clinic "that day" and "follow[] up by mail." R. 284–85. Although Ms. Nettle conceded in her deposition that she had no first-hand knowledge that the Clinic received her charge prior to her termination, she says she called Ms.

-8-

Hill later in the day of October 22 and Ms. Hill told her "she had faxed it," meaning the charge. R. 285; Aplt. Br. 24–25.

This is not enough to create a genuine dispute of fact. A court on summary judgment can accept evidence only when it would be admissible if offered in court. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment[.]"). Ms. Nettle's testimony that Ms. Hill told her that she (Hill) had faxed the charge on October 22 is inadmissible hearsay. Ms. Nettle could have obtained testimony from Ms. Hill directly, but did not. Accordingly, there is no admissible evidence in the record showing that the Clinic received the charge prior to Ms. Nettle's termination on November 1.

Alternatively, Ms. Nettle argues that the "protected activity" that caused her firing was more than simply her filing of an EEOC charge. Appellant's Br. 15. The district court held that Ms. Nettle's retaliation charge "did not complain that she was retaliated against because she voiced informal complaints to superiors or co-workers, because she disagreed with her placement on administrative leave or because she believed her placement on administrative leave was discriminatory." Dist. Ct. Op. 19 n.14. Ms. Nettle contends that the district court erred by reading her retaliation charge this "narrowly," and that the protected activity for which she suffered retaliation included earlier internal complaints to her superiors and co-workers.

Ms. Nettle is correct that "informal complaints" can be considered as protected activity. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007) (prohibition against retaliation "protects conduct short of filing a formal charge"). The issue before us is whether her second charge included a claim of this sort of protected activity.

The relevant part of Ms. Nettle's second charge read that she believed she had been retaliated against "for complaining of protected activity in my above-mentioned charge." R. 33. There is some garbled syntax here. (Why would she be retaliated against for *complaining* of *protected activity*?) But the meaning of the charge seems straightforward: Ms. Nettle charged that she had been terminated because she complained about discrimination in "the above-mentioned charge," which was her first Charge of Discrimination before the EEOC. Moreover, the "particulars" of the charge support this straightforward reading. In her second charge, Ms. Nettle recites that she filed her first charge of discrimination on October 22 and was fired on November 1. She then identifies who notified her of her termination and then concludes with the statement in question ("I believe I have been retaliated against . . ."), with no mention of any other protected activity. Further evidence in support of the district court's interpretation: Ms. Nettle entitled the second cause of action in her complaint "retaliation for filing a charge of discrimination." R. 16.

We agree with Ms. Nettle that we must read her charge liberally. *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir. 2000); *Brown v. Hartshorn Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988). But we cannot read her charge to include conduct she did not mention. While we can give her words a liberal construction, filling in gaps and reading vague terms expansively, we are not entitled to invent "*ex nihilo*, a claim which simply was not made." *Kells*, 210 F.3d at 836. The investigation called for by the language of the charge is obvious and limited: to see whether she had been retaliated against for filing her first charge of discrimination. Such claims are familiar in retaliation cases. *See, e.g., Denetclaw v. Thoutt Bros. Concrete Contractors, Inc.*, 287 Fed. App'x 17, 20 (10th Cir. 2008) (charge read "I believe that I have been terminated in retaliation for filing a Charge of Discrimination"); *Ross v. Porter*, 119 Fed. App'x. 209, 210 (10th Cir. 2004) ("Ross alleged . . . retaliation for filing a charge of discrimination"). If Ms. Nettle believed that she was retaliated against for other activity, in addition to her filing of the EEOC charge, she could have filed a new charge. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir. 2004) (holding that each discrete retaliatory action constitutes its own "unlawful employment practice for which administrative remedies must be exhausted" (citation omitted)).

Moreover, even if Ms. Nettle's EEOC charge could be interpreted as expansively as she now asks, her complaint in district court was expressly limited

-11-

to "retaliation for filing a charge of discrimination." R. 30. Whatever may be the reasons for liberal construction of an uncounseled EEOC charge, it is well established that claims not made in district court are waived. *United States v. Rogers*, 556 F.3d 1130, 1136 (10th Cir. 2009). Accordingly, we affirm the district court in granting summary judgment to the Clinic on her retaliation claim.

## III. Discrimination on the Basis of Color

### A. Hostile Work Environment

Title VII of the Civil Rights Act proscribes employment practices that "permeate the workplace with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Tademy v. Union Pacific Corp*., 520 F.3d 1149, 1156 (10th Cir. 2008) (internal citation and quotation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993). The district court held that "some of the comments and remarks"of her co-workers and supervisors could have caused Ms. Nettle subjectively to perceive that her working environment was hostile and abusive. Dist. Ct. Op. 13–14. But it also held that "from the objective standpoint," the "harassment or offensive conduct over the thirteen-year employment period was not sufficiently constant or frequent . . . that it could be

-12-

considered sufficiently pervasive or severe to survive summary judgment." *Id*. at 15.

The district court highlighted three deficiencies it saw in Ms. Nettle's case. First, it noted that, although Ms. Nettle had "named many individuals who she . . . contended harassed her. . . . [she] has not attributed offensive remarks to many of these alleged harassers, and she has not described the exact nature of many of the comments." Dist. Ct. Op. 14. Second, it noted that Ms. Nettle "had admitted that she cannot recall with any specificity the dates when many . . . comments were made." *Id*. Finally, although Ms. Nettle claimed to have been subjected to discrimination throughout her employment, "she has conceded that '[19]96 . . . until [19]99 were good years" and that she did not recall that Mr. Hunter directed any offensive comments at her during that time, except in jest. *Id*. at 15; *see* R. 242–43 (describing that in those years Mr. Hunter would "speak with [her]. . [and] promote any activities that [she] initiated or attempted to initiate or present; any requisition or anything [she] requested in regard to [her] youth groups wasn't denied.").

Ms. Nettle asks us to reverse the district court's holding. Her brief points to several pages in the record which summarize "the instances of discrimination because of her skin color" that Ms. Nettle alleges she has suffered. Aplt. Br. at 27. These stated instances suffer from many of the problems that the district court identified in its opinion. Dates are left unspecified. Ms. Nettle admitted

-13-

again and again that she could not recall the dates or events at which Mr. Hunter allegedly made the discriminatory comments. R. 167, 88–89. She also identified other people as making discriminatory remarks, but likewise could not give specific dates or events at which they were made. R. 90–91, 93, 95. Many of her allegations against Mr. Hunter are vague. In her deposition, she said that "[i]n 1993 in all staff meetings," there would always be "at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people," and from "1993 to [her] termination date there were statements of discrimination by Mr. Hunter." R. 88–89. In short, "[e]verything in a negative nature" came from Mr. Hunter. R. 250.

Some of this vagueness is inconsequential. A hostile work environment claimant need not establish precise dates for every insult. After all, the point of such claims is that the discrimination was ongoing and pervasive, that is, *all the time*, and not at isolated points in time. *See, e.g., Rocha Vigil v. City of Las Cruces*, 119 F.3d 871, 875 (10th Cir. 1997). Moreover, Ms. Nettle does recall some specific remarks by Mr. Hunter and others. She testified that Mr. Hunter commented that Ms. Nettle "thinks she's Indian, but we wonder. We have been trying to get rid of her since the day we hired her." R. 167–68. Mr. Hunter also said, according to Ms. Nettle, that people who did not look Indian "don't

-14-

represent the Indian community well."[1]  R. 246.  In addition, she points to specific remarks by other clinic members, for example, Daren Paddyaker's remark that Ms. Nettle was a "wannabe Indian," and Dawn Singleton's comment that she was the "white counselor."  R. 224, 232.   Affidavits from other employees allege that Robyn Sunday, the Chief Operating Officer of the clinic, referred to Ms. Nettle as "the big-boobed white Renee" on several occasions.  R. 366, 369.  Moreover, affidavits from two employees allege that those who did not appear "Indian" were treated differently at the Clinic.  R. 359, 365.  Finally, she alleged that child patients at the Clinic, and their parents, would sometimes refer to her as "white doctor."  R. 237.

A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *MacKenzie v. City & County of Denver,* 414 F.3d 1266, 1280 (10th Cir. 2005).  It is not the function of Title VII to make a federal case out of every insulting or unpleasant remark, even those related to protected status.  "[M]ere utterance of an . . . epithet which engenders offensive feelings in a employee  . . . does not sufficiently affect the conditions of employment to

---

[1]It appears that Ms. Nettle heard this remark second hand from the human resources director.  R. 246.  In fact, the only specific remark from Mr. Hunter Ms. Nettle appears to have alleged was the "she claims she's Indian, but we wonder" line.  *See* R. 397–98.

implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (quotations and internal citation omitted). Rather, a hostile work environment is one that a "reasonable person would find hostile or abusive." *Id.* This generally entails a "steady barrage of opprobrious [] comments." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005); *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).[2]

We do not believe that the district court erred in finding that Ms. Nettle's allegation of discrimination does not meet this standard. Ms. Nettle's allegations of identifiable discriminatory or harassing conduct constitute "sporadic . . . slurs" rather than a "steady barrage of opprobrious . . . comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). We also note, as did the district court, that Ms. Nettle was employed by the Clinic for over a decade, and that she conceded that she was treated favorably for a significant portion of that time, from 1996 to "around 1999." R. 242; *see* Dist. Ct. Op. 14–15.

Ms. Nettle's claims that Mr. Hunter would make "frequent" racial comments at staff meetings and was generally "negative," as well as the statements by her co-workers that there was discrimination at the clinic, do not

---

[2]The dissent complains that these precedents have "improperly converted a disjunctive analysis," 'severe or pervasive,' into a conjunctive analysis, requiring "severe and pervasive.'" Diss. Op. 10 n.4. But that is the governing law in this circuit, and Appellant has not asked us to revisit it.

-16-

rise to the level of creating a genuine dispute.  Ms. Nettle's claim that from "1993 to [her] termination date there were statements of discrimination by Mr. Hunter," R. 89, is overly vague both as to pervasiveness and as to severity.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact."); *see also Quevado v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1257 (9th Cir. 1988) (noting that Fed. R. Civ. P. 56(e) provides that party opposing summary judgment must "set forth specific facts that show there is a genuine issue for trial.").  Ms. Nettle testified that at "every staff meeting" in 1993—a decade before she lodged her complaint with the EEOC—Mr. Hunter made "at least one" racial slur, R. 88, but after that she offers no evidence regarding the frequency of his offensive remarks, other than to say that "'96 to around 1999 were favorable years for me in regard to the treatment." R. 242.  Nor does she supply much detail about the content of his comments.  It is not even clear that most of Mr. Hunter's comments were directed at her, or at persons of her ethnicity.  She describes comments he made about Comanches, Cheyennes, and Cherokees, but those are not her tribes.[3] Although there is some confusion about this in the record, Ms. Nettle understood that Mr. Hunter's ethnic makeup was similar to her own: both being half

---

[3]Ms. Nettle testified that Mr. Hunter "had said things about the Cherokees, something about a room full of Cherokees makes like a full blood or something like that.  And then he, you know, joked in there because I was there and I think he added the Delaware Tribe in on it." R. 241-42.  From her testimony, it does not appear that Mr. Hunter bore any particular animus against Ms. Nettle's tribe.

Caucasian, and both affiliated with the Delaware Nation and the Caddo. It cannot be assumed that all of his "comments about different tribes, and about those whose skin is lighter or darker than others," R. 390, related to her.

Nor do any of the particular comments recalled by Ms. Nettle strike us as sufficiently severe or opprobrious (considered objectively) that a reasonable jury would regard them "alter[ing] the conditions of the victim's employment and creat[ing] an abusive working environment." *MacKenzie,* 414 F.3d at 1280. Certainly none of the comments directed at (or around) Ms. Nettle rose to the level of being physically threatening or humiliating. *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (in determining hostile work environment, factors to be considered include whether the discriminatory conduct is "physically threatening or humiliating, or a mere offensive utterance"). Many of the statements she complains about simply identify her as "white" or as not really an Indian.[4] Ms. Nettle testified that she "heard once" that Mr. Hunter said that the Delaware Tribe "was the tribal wannabes." R. 241. We can easily understand that it could be annoying and irritating for a person of one racial mix to be mistaken for another, but there is no precedent for regarding a mistaken racial identifier—not employing any epithetical terminology—as opprobrious or abusive.

---

[4]The dissent focuses on Robyn Sunday's alleged description of her as "the big-boobed white Renee." R. 366, 369. But the sting in the comment is its sexism, and Ms. Nettle has not complained of sex discrimination.

-18-

Moreover, as Ms. Nettle concedes, many of the comments were made jokingly. *See, e.g.*, R. 219 (board president "making jest of Cherokees")[5]; *id.* at 220–21 (Dawn Singleton would "joke" about not going anywhere because she was not Indian and had blonde hair and green eyes); *id.* at 224 (Tracy Mailo would make "statements in jest at meetings regarding my skin color"); *id.* at 226 (explaining that she would interpret comments made "in jest . . . to be in light or not wanting to offend as much as in regard to statements being made that are intended to be disparaging in nature" and stating that "many" of Mr. Hunter's comments "were intended to be in jest"); *id.* at 229 (offering that she no longer found a staff member's comments offensive because as "the years wore on . . . I knew she didn't mean [them] disparagingly"); *id.* at 241 ("[m]ost times" Mr. Hunter said something about a tribe it was "in jest."). Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having "alter[ed] the conditions of the victim's employment and create[d] an abusive working environment." *Harris*, 510 U.S. at 22.

The dissent merits a reply on three points. First, noting that some of Ms. Nettle's patients, or the parents of her patients, would call her the "white doctor,"

---

[5]The transcript of Ms. Nettle's testimony spells the word as "gist" rather than "jest." Because the context makes clear Ms. Nettle was speaking of "jesting" behavior, we have altered the transcript. *See* R. 91 ("Q. What do you mean, in gist? A. Just joking . . .").

Aplt. Br. 37, R. 237–39, the dissent maintains that comments made by patients at the Clinic are "relevant to the present inquiry" and that it is not "determinative" that "the patients were not employees of the clinic." Dissent 12. While our precedent does not categorically exclude comments made by patients or customers from consideration of a hostile work environment, we believe such claims are of little significance in the context of this case. Ms. Nettle's patients were children, and there is no reason to think that their (or their parents') identification of her as the "white doctor" was malicious, intended to be hurtful, or anything other than mistaken ethnic identification. Ms. Nettle testified that although she went through a stage where it hurt her to be called "white doctor," and that this would make her "angry sometimes," she "dealt with the children," who trusted her, and she "didn't find [the comments] as a problem at the very end" because she was so busy. R. 237. Moreover, Ms. Nettle presents no evidence that her employer *encouraged* her patients to refer to her as the "white doctor," as opposed to "Ms. Nettle," only that her co-workers would "hear" patients or their parents calling her white doctor and "participate in it." R. 239.

The dissent cites *Lockard v. Pizza Hut, Inc*., 162 F.3d 1062, 1073 (10th Cir. 1998) to support its assertion that employers may be held responsible for the conduct of their customers, but the facts of *Lockard* are suggestive in defining the limitations on the argument. In *Lockard*, Ms. Lockard had been subjected to crude, sexually harassing comments and physically threatening conduct (grabbing

-20-

her hair and breast) from a group of customers. *Id.* at 1072. When told that she did not want to serve the harassing customers, as she had on three previous occasions, her employer responded that she was "hired to be a waitress" and that she needed to go serve them. *Id.* at 1067, 1074–75. Both the nature of the comments and the character of the employer's actions are obviously far afield from those that confronted Ms. Nettle at the Indian Clinic. We do not believe the facts show that Ms. Nettle's employer "condone[d] or tolerate[d]" a hostile work environment based on the scattered comments of her patients or their parents. *Id.* at 1073–74.

Second, the dissent downplays the fact that many of the relevant comments were made in jest. The dissent claims that the "[w]hether a comment is intended to be insulting or 'in jest' is irrelevant to whether there is a steady barrage of opprobrious comments." Dissent 6. But the case cited by the dissent holds only that comments need not be *directed at* or *intended to be received* by the victim to be evidence of a hostile work environment. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007). In that case, we held that vulgar e-mail not intended for a recipient, but nonetheless intercepted by her, could be evidence of discrimination. This does not mean that the nonmalicious character of comments, as understood both by the speakers and by the recipient of the messages, is "irrelevant" to whether they create a "hostile" or abusive work environment. *PVNF* does not hold otherwise, and our caselaw supports the point, under

-21-

circumstances arguably more humiliating than these. *See, e.g.*, *Denetclaw v. Thoutt Bros. Concrete Contractors*, 287 Fed. App'x 17, 22 (10th Cir. 2008) (discrimination against Native American who was frequently asked to perform "rain dances" found not to be severe in part because plaintiff himself "characterized [the remarks] as joking and kidding").

Of course, what is funny to one person may be deeply offensive to another. What the speaker intended by his remark is not dispositive, and racial insults are not permissible merely because the speaker regards them as humorous. But Ms. Nettle herself says that she interpreted many of the comments made by Mr. Hunter and others as joking, and not disparaging, because she knew they were not intended to offend. *See* R. 240 (calling the years 1996–1999 as "good years" in which Mr. Hunter did not say anything "directly in regard to [Ms. Nettle] other than in jest."); *id.* at 241 (distinguishing between comments that were "in jest" and those that were "disparaging"). When evaluating the totality of the circumstances, we cannot disregard the distinction between jesting and insulting.

Third, the dissent takes us to task for failing to consider the fact that Ms. Nettle was not selected to represent the Clinic at certain events in our analysis of the "totality of circumstances" analysis in the previous section. Dissent 13–14. In her testimony, Ms. Nettle pointed to not being allowed to attend the Heritage Celebration at the state capitol and a Oklahoma University Health Sciences Center event, allegedly because as a light-skinned Native American, she did not

-22-

"represent" Native Americans well. R. 264; *see also* R. 362. We disagree that not being able to attend two events which, as we note in the following section, were only at best a discretionary part of her job, amounts to discrimination that is "severe." Nor does the fact of being prevented from attending two events from a many-year career show that Ms. Nettle experienced "pervasive" discrimination during her employment at the Clinic.

From the record, we can see that at many points during her employment, the Clinic was not a pleasant place for Ms. Nettle to work. People said crude things, pet projects were taken away from her, and she was made to feel singled out because of her Caucasian appearance. But Title VII's standard for redress is a *hostile* work environment, not an unpleasant one. *See, e.g.*, *Duncan v. Manager, Dept. of Safety, City & County of Denver*, 397 F.3d 1300, 1313–14 (10th Cir. 2005) (Title VII provides no remedy for boorish behavior or bad taste); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (unpleasant and boorish conduct does not create a hostile work environment). Incidents spread out over many years, and which indicate mostly poor taste and lack of professionalism, do not rise to the level of a hostile work environment. *See, e.g.*, *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998). With all due respect to the dissent, we believe that the dissent's standard for pervasiveness and severity falls short of what this court and the Supreme

-23-

Court have set forth, and would make a broad swath of American workplaces subject to liability under Title VII.

We therefore affirm the district court's ruling that the Indian Clinic is entitled to summary judgment on Ms. Nettle's hostile work environment claim.

## B. Adverse Employment Action

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to show discrimination Ms. Nettle must establish that (1) she is the member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). The Clinic does not dispute that Ms. Nettle is in a protected class, which she has "described as 'light-skinned Native Americans.'" Dist. Ct. Op. 16. The district court, however, agreed with the Clinic that Ms. Nettle failed to make the necessary primary showing that she had suffered an adverse employment action. *Id*. at 18.

Ms. Nettle concedes that in the period identified in her first EEOC charge—March 10, 2004 to October 20, 2004—she "did not lose any salary nor receive an official demotion" but that nonetheless "the evidence shows that the terms and conditions of her employment were altered." Aplt. Br. 38–39. Ms.

Nettle points to the removal of Thanksgiving and Christmas Drives from her job functions (programs which she had started); her relocation to a new office; not being allowed to set up a booth at the Oklahoma University Health Sciences Center; and being pulled from attending Native American Heritage week at the state capital, among other things. R. 168–69, 362. It is not evident from the record that the removal of the Thanksgiving and Christmas programs occurred within the time period in which Ms. Nettle alleged discrimination, but even if it did, we do not see any of the events cited by Ms. Nettle affecting her terms and conditions of employment. Although we take a "case by case approach," and do not limit ourselves to finding monetary loses or loss of benefits to constitute an adverse action, the action must rise above the level of "a mere inconvenience or an alteration of job responsibilities." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

Ms. Nettle's job description included a clause that said she would be required to "perform[] other duties *as assigned*." R. 205, 404. She said in her deposition that she considered the Thanksgiving and Christmas drives to be part of the assigned duties. R. 206. But there is no inconsistency with the job description that some duties, once assigned, should later be unassigned as necessary. Moreover, the various additional duties she was given do not reach the core of the description of her position as "Native American Youth Specialist": "to provide Health Promotion/Disease Prevention services directed towards American

-25-

Indian youth for the Community Services Department." R. 403. The fact that Ms. Nettle was prevented from attending some external events does not represent a significant change in her employment status. *See Piercy*, 480 F.3d at 1203 (adverse employment action includes "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (citation omitted)).

Because we hold that Ms. Nettle did not suffer an adverse employment action, we do not reach the other steps in the test for showing discrimination.

## IV. National Origin Discrimination

Ms. Nettle finally argues that she should be able to make a claim for national origin discrimination, even though she did not check off "national origin" on her first EEOC charge. The "particulars" of the charge stated that Ms. Nettle and other employees were "being treated differently *because of* [their] *tribe* or skin color." R. 18 (emphasis added). She also alleged in the particulars that during meetings, Mr. Hunter would "make comments about different *tribes*." *Id*. (emphasis added). The district court found that because Ms. Nettle did not "identify national origin as a basis for discrimination in her EEOC" charge (by not checking the box), she had not administratively exhausted her claim. Accordingly, it did not permit Ms. Nettle "to expand the scope of [her] lawsuit and include at this late date" a national origin claim. Dist. Ct. Op. 24.

-26-

The Ninth Circuit, in a case cited by Ms. Nettle, held that discrimination against an Indian tribe could give rise to a national origin claim under Title VII, because Indian tribes could be "considered nations." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 154 F.3d 1117, 1120 (9th Cir. 1998) (different Indian tribes "were at one time considered nations, and indeed still are to a certain extent"). The Clinic does not challenge the very idea of national origin discrimination based on membership in a tribe in its brief before us, so we assume without holding that one can bring a legitimate claim of national origin discrimination based on discrimination against one's tribe.

We must therefore consider whether Ms. Nettle can be said to have made such a claim in her original charge. To "effectuate the remedial purposes of Title VII," courts are to liberally construe charges filed with the EEOC. *Harrell v. Spangler, Inc.*, 957 F. Supp. 1215, 1219 (D. Kan. 1997). Accordingly, "the crucial inquiry is whether the claims set forth in the civil complaint fall within the scope of the investigation that could reasonably be expected to grow out of the EEOC charges." *Id.* Although Ms. Nettle did not check the box for national origin in her charge, she did state, in the particulars, that she believed she was being discriminated against because of her tribe. Moreover, in her complaint, Ms. Nettle explained that Mr. Hunter "made statements regarding the Delaware Tribe . . . as being want-to-be's which indicates Plaintiff wants to pretend and be like Indians of browner skin." R. 26. Mr. Hunter, the complaint continued, "also

-27-

made statements regarding Cheyenne-Arapaho Tribal employees, Comanche employees, Cherokee and Choctaw Tribal employees." *Id.*

It seems clear from the charge that Ms. Nettle was alleging national origin discrimination, and that it provided adequate notice to the Clinic. *See Stephens v. City of Topeka* 33 F. Supp.2d 947, 950 (D. Kan 1999). In *Stephens*, the plaintiff did not check the box "race" on his charge, and wrote in his charge that "I believe I was treated differently because of my National Origin and my age, because younger, white managers/employees . . . were treated differently." *Id.* The district court held that because Mr. Stephens said he was treated differently from other "white" employees, this suggested he was (also) making an allegation of racial discrimination. *Id.* In this case, as well, Ms. Nettle made claims in her charge related to Mr. Hunter's comments about various other tribes, claims which relate to Ms. Nettle's national origin.

In her Complaint in district court, however, Ms. Nettle did not allege discrimination based on tribe or national origin. Her Complaint alleged discrimination "on account of race and color" alone. Only in her reply to the Clinic's motion for summary judgement did Ms. Nettle drop her claim of race discrimination only to ask to be "allowed to maintain a cause of action for national origin discrimination." R. 191.

As noted above, plaintiffs are confined to the claims they timely raise in their complaint. A plaintiff "may not amend her complaint through allegations

-28-

made in response to a motion for summary judgment." *Griffen v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004). Here, concerns about proper notice come to the fore. Indeed, part of the Clinic's strategy in its motion for summary judgment was to concede that Mr. Hunter had made comments about Ms. Nettle's tribal affiliation, but to argue that statements about tribal affiliation could not support a claim for race or color discrimination, which is what Ms. Nettle alleged. R. 59. It hardly seems fair that Ms. Nettle in reply, could argue that—all along—she was really alleging national origin discrimination, and that she should be allowed to proceed on those grounds, rather than the grounds which she presented in her Complaint. While Ms. Nettle's charge could be read as encompassing a national origin discrimination claim, the same cannot be said of her Complaint.

Even if we were to read Ms. Nettle's Complaint to encompass national origin discrimination, we doubt that it could withstand a motion for summary judgment. Ms. Nettle's specific (i.e., not vague) race and national origin claims appear to rely on much the same information we have already considered in connection with her claim for *color* discrimination (for example, that some tribes had lighter skin color than other tribes, R. 12). We have already concluded that this evidence was insufficient to survive summary judgment. Unless Ms. Nettle has other facts, which she did not put forward even in her reply to the motion for summary judgment, then the facts pertaining *only* to national origin discrimination make up a smaller set of the available facts pointing to

discrimination of any kind.  If she did not survive summary judgment on the larger set of facts, *a fortiori*, she could not survive it with the smaller set.

## V.  Conclusion

We AFFIRM the judgment of the district court.


Entered for the Court


Michael W. McConnell
Circuit Judge

08-6023, Nettle v. Centr. Okla. Am. Indian Health Council

**BRISCOE, J.,** Circuit Judge, concurring in part and dissenting in part.

I concur in part and respectfully dissent in part. With one exception, I agree with the majority. Regarding the hostile work environment claim, I read the majority's opinion to improperly consider witness credibility, improperly weigh evidence, and omit meaningful analysis of the totality of the circumstances surrounding Nettle's allegations. Accordingly, I would reverse the district court's grant of summary judgment for the Clinic on Nettle's hostile work environment claim.

To affirm the district court's grant of summary judgment on Nettle's hostile work environment claim, the majority begins by quoting the standard elements of such a claim—a plaintiff must show that a rational jury could find that the workplace was "permeate[d] . . . with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Maj. Op. at 12 (quoting Tademy v. Union Pac. Corp., 520 F.3d 1149, 1156 (10th Cir. 2008)). The majority then implicitly divides Nettle's allegations into several categories— "vague" statements, comments "made in jest," specific statements, patient statements, and removed employment duties—and then affirms the grant of summary judgment for each category. While I disagree with the majority opinion's reasoning for these individual categories, I am more troubled by the majority's parsing of Nettle's allegations. "[O]ur hostile environment cases

consistently have emphasized the need for the district court to examine the totality of the circumstances when reviewing a summary judgment motion. Indeed, the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation." Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1262 (10th Cir. 1998) (citation omitted).

I.    Divided Allegations

A.    "Vague" Allegations

The majority reviews the district court's three-pronged reasoning for granting summary judgment. Two of the identified reasons relate to the specificity of Nettle's allegations. E.g., Maj. Op. at 13 ("[S]he has not described the exact nature of many of the comments," and "she cannot recall with any specificity the dates when many . . . comments were made.").[1] The third reason isolates Nettle's concession that portions of her employment "were good years." Id.[2] The majority agrees with the district court's assessment of Nettle's

---

[1] Unless otherwise specified, I omit the majority's quotation of the district court opinion.

[2] Nettle was employed with the Clinic for "thirteen[]year[s]," ending in 2004. Maj. Op. at 12. Nettle conceded that "[19]96 . . . until [19]99 were good years." Id. at 13. The majority opinion makes much of this concession, "not[ing] . . . that Ms. Nettle was employed by the Clinic for over a decade, and that she conceded that she was treated favorably for a significant portion of that time, from 1996 to 'around 1999.'" Id. at 16.

The majority opinion's reliance on this time period raises two concerns. First, a reasonable inference would be that the last five years of Nettle's employment were not good years. If three years constitutes a "significant portion" of Nettle's tenure with the Clinic, then a more recent five years is a more consequential quantity of her

(continued...)

allegations.  Id. at 13 ("The[] [allegations in Nettle's appellate brief] suffer from many of the problems that the district court identified in its opinion.").  The majority affirms the grant of summary judgment for this category of Nettle's allegations—"that Mr. Hunter [the Chief Executive Officer at the Clinic] would make 'frequent' racial comments at staff meetings and was generally 'negative,' as well as the statements by her co-workers that there was discrimination at the [C]linic"—by applying the standard that "[v]ague, conclusory statements do not suffice to create a genuine issue of material fact."  Id. at 16–17.  The majority opinion also discounts Nettle's allegations regarding Hunter's comments by concluding, "It cannot be assumed that all of his comments about different tribes, and about those whose skin is lighter or darker than others, related to her."  Id. at 17 (quotation and citation omitted).

In my view, this reasoning improperly weighs the credibility of Nettle's submitted evidence and labels comments as "vague and conclusory" when they are not.  Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105–06 (10th Cir. 2008)

---

[2](...continued)
employment.  Second, I fail to understand how this concession negates her hostile work environment claim.  The central analysis should be the totality of the circumstances surrounding Nettle's employment.  Penry, 155 F.3d at 1262 ("'A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents [or periods], but on the overall scenario.'") (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)); Maj. Op. at 14 ("After all, the point of such claims is that the discrimination was ongoing and pervasive . . . and not at isolated points in time.").

("[I]t is not our province at the summary judgment stage to . . . make credibility determinations.").

As stated by the majority, "Nettle is one-half Caucasian and one-half Native American, a member of the Delaware/Caddo Tribes." Maj. Op. at 2. There is no dispute that Nettle was a light-skinned Native American, and that Hunter allegedly targeted her for ridicule because of her skin color, including comments regarding the Delaware Tribe such as "they want to pretend and be like Indians of browner skin." R. 12; R. 154.

The majority also acknowledges that Nettle alleges that "in 1993 in all staff meetings, there would always be at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people and from 1993 to her termination date [in 2004] there were statements of discrimination by Mr. Hunter," but the majority characterizes this allegation as "vague." Maj. Op. at 14 (quotations and alterations omitted). While I concede that the cited statement could benefit from more specificity, portions of the statement do not equivocate on the key proofs: frequency, location, content, and target of the alleged offensive comments. Nettle's statement is based on personal knowledge. With the specifics she has set forth, she has presented more than a "bald assertion" that she suffered from a hostile work environment. Moreover, because Nettle's statement does not draw any improper inference or implicit conclusion, I do not consider the statement to be conclusory.

-4-

I also disagree with the majority's assertion that "[i]t cannot be assumed that all of [Mr. Hunter's] comments about different tribes, and about those whose skin is lighter or darker than others, related to [Nettle]." Maj. Op. at 17. At the summary judgment stage, "we must construe all facts and reasonable inferences in favor of the non-moving party." Bryant v. Indep. Sch. Dist. No. I-38, 334 F.3d 928, 931 (10th Cir. 2003). Here, Nettle is the non-moving party. If Nettle's allegations are true, which must be assumed at this stage, then this evidence would support her hostile work environment claim because it demonstrates a workplace "permeate[d] . . . with discriminatory intimidation, ridicule, and insult." Tademy, 520 F.3d at 1156 (internal quotation omitted). It should be the role of a fact finder in this case, and not the district court on summary judgment, to determine whether the alleged comments made to and about Nettle altered the conditions of her employment.

B.      "Comments made in jest"

The majority also discredits portions of Nettle's allegations as comments made only in jest. Maj. Op. at 19, 21–22. The majority highlights that "as Ms. Nettle concedes, many of the comments were made jokingly." Id. at 19 (listing record citations where Nettle identifies comments as being made "in jest"). Indeed, the majority notes that in certain circumstances Nettle "no longer found a staff member's comments offensive because as the years wore on [Nettle] knew she didn't mean them disparagingly." Id. at 19 (quotation and alterations

-5-

omitted).  Although the majority acknowledges that "what is funny to one person may be deeply offensive to another," the majority proclaims that "we cannot disregard the distinction between jesting and insulting."  Id. at 22.  Accordingly, the majority determines that Nettle's allegations of comments made "in jest" are insufficient to create an abusive working environment, stating "where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having 'alter[ed] the conditions of the victim's employment and create[d] an abusive working environment."  Id. at 19 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)).

I consider this analysis flawed for several reasons.  Whether a comment is intended to be insulting or "in jest" is irrelevant to whether there is a steady barrage of opprobrious comments.  See EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007) ("We have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim.").  The analysis for whether a statement contributed to a hostile work environment is whether the "victim herself perceived the environment to be abusive" and whether the statement was "so severe or pervasive that an objectively reasonable person would find it abusive or hostile."  Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1089 (10th Cir. 2007) (citing Harris, 510 U.S. at 21).  Thus, statements intended to be

-6-

"in jest" can still be opprobrious if they are subjectively and objectively severe or pervasive. No analysis of the "jester's" intent is necessary.

The majority responds that "[t]his does not mean that the nonmalicious character of comments, as understood both by the speakers and by the recipient of the messages, is 'irrelevant' to whether they create a 'hostile' or abusive work environment." Maj. Op. at 21. I agree with a portion of this statement. If the recipient of the messages finds the comments to be nonmalicious, the comment fails the subjective portion of the analysis. In that context, the statements made "in jest" would not contribute to a hostile work environment. Conversely, statements that only the speaker considers nonmalicious—but the recipient considers offensive—could contribute to a hostile work environment if they are objectively severe or pervasive.

The majority overlooks this distinction. The majority relies on Nettle's statement that some of the statements were made in jest and that she did not find certain, but not all, comments "disparaging[] because she knew they were not intended to offend," id. at 23, as license for the majority to disregard all comments made "in jest." Simply because Nettle identified comments as "in jest" does not mean that the comments were not subjectively and objectively severe or pervasive. Moreover, Nettle's ability to distinguish offensive comments from comments received "in jest" and considered to be nonmalicious arguably lends credence to her allegations of frequent racial comments that were not received "in

jest." Thus, the majority's conclusion—"where comments are made in jest and the plaintiff recognizes them as such," these identified comments cannot support a hostile work environment claim—is not universally applicable to all comments made "in jest." Id. at 19. Because the majority makes no effort to distinguish between comments made "in jest" that Nettle considered offensive and comments made "in jest" that Nettle considered nonmalicious, the majority's assertion that "we cannot disregard the distinction between jesting and insulting" is specious. Id. at 23.

In addition to blurring the subjective and objective analysis, the majority's discussion of comments made "in jest" also subtly raises the threshold for hostile work environment claims to be actionable. The majority notes that comments made in jest cannot "be regarded as having 'alter[ed] the conditions of the victim's employment and create[d] an abusive working environment," "unless they are of <u>unusual</u> pervasiveness or severity." Id. at 19 (citing <u>Harris</u>, 510 U.S. at 22) (emphasis added). First, although the defendant in <u>Harris</u> "claimed he was only joking," the analysis of <u>Harris</u> does not address or distinguish comments made in jest. <u>Harris</u>, 510 U.S. at 19. Second, <u>Harris</u> notes that "Title VII is violated" when the discriminatory comments are "<u>sufficiently</u> severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 21 (emphasis added). I consider the majority's "unusually" severe or pervasive standard to create a higher threshold of proof for Nettle than

the accepted "sufficiently" severe or pervasive standard. Consequently, the

majority cites <u>Harris</u>, but heightens the standard <u>Harris</u> set forth. <u>Harris</u>,

however, clarifies that the "severe or pervasive" standard is the baseline for

actionable hostile work environment claims and rejects a more stringent standard.

<u>Harris</u>, 510 U.S. at 22.

C.    Specific Allegations

On the other hand, the majority admits that "[s]ome of this vagueness is

inconsequential." Maj. Op. at 14. The majority then lists some "specific

remarks": (1) "Mr. Hunter commented that Ms[.] Nettle 'thinks she's Indian, but

we wonder. We have been trying to get rid of her since the day we hired her,'"

<u>id.</u>; (2) "Mr. Hunter also said . . . that people who did not look Indian 'don't

represent the Indian community well,'" <u>id.</u>; (3) "Daren Paddyaker[] remark[ed]

that Ms. Nettle was a 'wannabe Indian,'" <u>id.</u> at 15; (4) "Dawn Singleton[]

comment[ed] that [Nettle] was the 'white counselor,'" <u>id.</u>; (5) "Robyn Sunday, the

Chief Operating Officer of the [C]linic, referred to Ms. Nettle as 'the big-boobed

white Renee' on several occasions,"[3] <u>id.</u>; (6) "[T]wo employees allege that those

who did not appear 'Indian' were treated differently at the Clinic," <u>id.</u>; and (7)

---

[3] The majority chides the dissent for "focus[ing]" on this alleged description and considers the "sting in the comment [to be] its sexism." Maj. Op. at 18 n.4. This criticism by the majority for "focus[ing]" on Sunday's description is puzzling as this reference to the description, which quotes the majority opinion, is the only reference to the full description. Further, by finding "sting" in only the sexist portion of the remark, the majority disregards entirely the "white Renee" portion of the description.

"[C]hild patients at the Clinic, and their parents, would sometimes refer to her as 'white doctor,'" id. The majority affirms the grant of summary judgment for these specific allegations because they "constitute 'sporadic . . . slurs' rather than a 'steady barrage of opprobrious . . . comments.'"[4] Id. at 16 (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)). The majority opinion also reduces many of these allegations to "simply identify[ing] her as 'white'" and concludes that "it could be annoying and irritating for a person of one racial mix to be mistaken for another, but there is no precedent for regarding a mistaken racial identifier . . . as opprobrious or abusive." Id. at 18.

By quoting the "steady barrage of opprobrious . . . comments" language, the majority disregards several aspects of Nettle's allegations and Tenth Circuit precedent. Some of Nettle's allegations involve more than comments; Nettle also alleged discriminatory conduct. Some of Nettle's allegations include a steady barrage of comments; Nettle also alleged that at "staff meetings, there would

---

[4] The Supreme Court has repeatedly stated that "[f]or . . . harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quotation omitted); Pa. State Police v. Suders, 542 U.S. 129, 133 (2004). This court has analyzed the severe or pervasive element by applying the majority's "steady barrage of opprobrious [] comments" language in several opinions. E.g., Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (quoting Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005); Ford v. West, 222 F.3d 767, 777 (10th Cir. 2000) (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)). Arguably, by requiring a "steady barrage" and "opprobrious comments," this application has improperly converted a disjunctive analysis, "severe or pervasive," into a conjunctive analysis, requiring "severe and pervasive."

-10-

always be at least one discriminatory or racial slur against different tribal affiliations or lighter-skinned people." Maj. Op. at 14 (internal quotation omitted). Similarly, given that three of the listed seven specific allegations include ongoing conduct—Sunday's insulting description of Nettle being made "on several occasions," that "those who did not appear 'Indian' were treated differently at the Clinic," and that Clinic patients and their parents "would sometimes refer to her as 'white doctor'"—there is no basis for the majority's description of the conduct targeting Nettle as "sporadic" in nature.

There is also no basis to support the majority opinion's conclusion regarding racial misidentification. It is unclear how the majority opinion could find only mistaken racial identity in such comments as, "Nettle thinks she's Indian, but we wonder" or "wannabe Indian." Id. at 14–15. To the contrary, in this context it is clear that the description "white Renee" is likely not an example of mistaken racial identity. To me, affirming a grant of summary judgment on discriminatory comments regarding a person's skin color merits more precise analysis because words and epithets regarding a person's race and color can be "intensely degrading." See PVNF, 487 F.3d at 799 (quoting Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir. 1996) and considering a sexual epithet); Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . .

-11-

by a supervisor in the presence of his subordinates.") (internal citation and quotation omitted).

D.     Patient Statements

Nettle alleges that "the patients [of the Clinic] would call her the 'white doctor.'" Aplt. Br. at 37; R. 183, 234. The majority opinion "believe[s] such claims are of little significance in the context of this case," because "Nettle presents no evidence that her employer <u>encouraged</u> her patients to refer to her as the 'white doctor . . . .'" <u>Id.</u> at 20.

Because comments made by the patients and their parents are part of Nettle's workplace environment, they are relevant to the present inquiry. That the patients and their parents were not employees of the Clinic is not determinative. The Clinic may be held responsible for comments by its patients and their parents because there is evidence that they should have known about such comments. <u>See Lockard v. Pizza Hut, Inc.</u>, 162 F.3d 1062, 1073 (10th Cir. 1998) ("We agree with our sister circuits that an employer may be found liable for the harassing conduct of its customers."); <u>id.</u> at 1074 ("[E]mployers may be held liable in these circumstances if they fail to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." (quotation omitted)). Accepting Nettle's allegations as true, if the Clinic introduced Nettle as "white," it should expect its patients and their parents to follow suit and refer to Nettle as "white." By this

-12-

conduct—although it is not clear that the threshold standard requires Nettle to present such evidence—the Clinic arguably has "encouraged" the patients and their parents to refer to Nettle as "white."

E.     Removed Employment Duties

While the majority lists the allegation that "Mr. Hunter said . . . that people who did not look Indian 'don't represent the Indian community well,'" Maj. Op. at 14, Nettle also alleges that she was prevented from representing the Clinic at certain events because she did not "look Indian." Aplt. Br. at 37; R. 168, 246. With little analysis, the majority opinion brushes these allegations aside as being not severe or pervasive. Maj. Op. at 23 ("We disagree that not being able to attend two events which, . . . were only at best a discretionary part of her job, amounts to discrimination that is 'severe.' Nor does the fact of being prevented from attending two events from a many-year career show that Ms. Nettle experienced 'pervasive' discrimination during her employment at the Clinic.").

Although the majority would discount this evidence, I consider Nettle's allegations that she was prevented from representing the Clinic in the community because she did not "look Indian" to be relevant to and give weight to her hostile work environment claim. These allegations, if assumed to be true, are indicative of a workplace where Nettle's skin color impacted her employment status with her employer, her co-workers, and the community the Clinic served. Further,

these allegations contradict other portions of the majority's reasoning. The majority dismisses all of Nettle's specific allegations as sporadic or infrequent "comments." Prohibiting Nettle from representing the Clinic because of her skin color is not a comment; it is an action that directly affects Nettle's work responsibilities, performance, and status. Only examining whether this alleged conduct was by itself "severe" or "pervasive" disregards the impact of the conduct in the coherent analysis of whether her workplace environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment." McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001); Tademy, 520 F.3d at 1162 (listing "whether it unreasonably interferes with [her] work performance" as a consideration in analyzing the frequency or severity of the discriminatory conduct).

II.     The Totality of the Circumstances

In my view, the most problematic aspect of the majority's divide-and-conquer analysis is that it does not consider Nettle's allegations in the context of the totality of the circumstances. We have rejected this approach. See PVNF, 487 F.3d at 799 ("By parsing out the various instances of harassment and characterizing them as gender-neutral, or not pervasive, [the employer] seeks to eschew the proper totality of the circumstances test, which is the touchstone of our analysis of hostile work environment claims." (quotation omitted)).

Moreover, any totality of the circumstances analysis should be considered "'from the perspective of a reasonable person in [Nettle's] position.'" McCowan, 273 F.3d at 923 (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998)).

There is no indication that the majority considered these circumstances from the viewpoint of a reasonable person in Nettle's position. Instead, the majority parses and dismisses allegations of discriminatory conduct without regard to Nettle's circumstances. E.g., Maj. Op. at 16 ("Nettle's allegations of identifiable discriminatory or harassing conduct constitute 'sporadic . . . slurs' rather than a 'steady barrage of opprobrious . . . comments.'"); id. ("Nettle's claims that Mr. Hunter would make 'frequent' racial comments at staff meetings and was generally 'negative,' as well as the statements by her co-workers that there was discrimination at the clinic, do not rise to the level of creating a genuine dispute."); id. at 19 ("Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having 'alter[ed] the conditions of the victim's employment and create[d] an abusive working environment.'"); id. at 21 ("We do not believe the facts show that Ms. Nettle's employer 'condone[d] or tollderate[d]' a hostile work environment based on the scattered comments of her patients and their parents."); id. at 23 ("We disagree that not being able to attend two events which, . . . were only at best a discretionary part of her job, amounts

to discrimination that is 'severe' [or pervasive].").  By segregating subsets of allegations and then analyzing each subset in isolation, the majority fails to consider the totality of the circumstances when addressing Nettle's hostile work environment claim.  See McCowan, 273 F.3d at 925 (suggesting that even conduct that is not explicitly discriminatory may still form a part of the totality of the circumstances).

The majority's sole effort to put all of these allegations together in context acknowledges that, "the Clinic was not a pleasant place for Ms. Nettle to work. People said crude things, pet projects were taken away from her, and she was made to feel singled out because of her Caucasian appearance."  Maj. Op. at 23. The majority, however, concludes that "Title VII's standard for redress is a hostile work environment, not an unpleasant one," stating that Title VII does not remedy boorish, unpleasant conduct and bad taste.  Id.

By this reasoning, the majority either improperly weighs evidence or reduces hostile work environment claims to semantics.  It is axiomatic that at the summary judgment stage, "it is not our province . . . to weigh the evidence . . . ." Sanders, 544 F.3d at 1105–06.  In the context of hostile work environment claims, this prohibition against weighing evidence gains significance as we have noted that the "severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  Herrera, 474 F.3d at 680 (quotation omitted).

Based on these precedents, I cannot agree with the majority's characterization of Nettle's workplace as merely "unpleasant" and not "hostile." Nettle does not allege simply boorish conduct or behavior in bad taste. She alleges conduct that "singled [her] out because of her Caucasian appearance," Maj. Op. at 23, including frequent racially-based comments, jokes, and decisions that impacted her job duties. The majority offers no explanation for why Nettle's subjective view of her workplace is objectively insufficient to support her hostile work environment claim.

In the final analysis, I would conclude that Nettle's allegations, taken as a whole, are sufficient to create a question of fact as to whether her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment." McCowan, 273 F.3d at 923. I would reverse the district court's grant of summary judgment on Nettle's hostile work environment claim.